**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LINDA DUMANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 05-1113 |
| v. | ) | |
| | ) | |
| EQUITABLE RESOURCES, INC., | ) | Judge Terrence F. McVerry |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| Defendant. | ) | Re: Doc. No. 8 |

**REPORT AND RECOMMENDATION**

I.    RECOMMENDATION

_____It is respectfully recommended that the Motion for Summary Judgment filed by

Defendant Equitable Resources, Inc. at Docket No. 8 be granted.

II.    REPORT

_____Plaintiff Linda Dumann ("Plaintiff") brings this claim of age discrimination in

employment under the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania

Human Relations Act ("PHRA"), 43 Pa. Stat. § 951 et seq.  Plaintiff also claims gender

discrimination in employment under Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000e et seq. ("Title VII") and the PHRA.  Specifically, Plaintiff claims that Defendant

Equitable Resources, Inc. ("Defendant" or "Equitable" or "Company") terminated her

employment on the basis of her age and gender in violation of the ADEA, Title VII, and the

PHRA.

_____The issue presented in Defendant's Motion for Summary Judgment is whether

Plaintiff has adduced sufficient evidence to prove that Defendant's articulated reasons for terminating Plaintiff's employment are pretext for age and gender discrimination.  Because the Court finds that no material issues of fact exist and that Defendant is entitled to judgment as a matter of law, the Court recommends that Defendant's Motion for Summary Judgment be granted.

        A.     <u>Relevant Facts</u>

Viewing the facts in a light most favorable to Plaintiff, the following are relevant to the pending Motion for Summary Judgment.

Equitable is an integrated energy company, with an emphasis on natural gas supply activities including production and gathering, and natural gas distribution and transmission.  (Doc. No. 9 at ¶ 1, Doc. No. 30 at ¶1.)[1]  Equitable offers energy products and services through two business segments: Equitable Utilities and Equitable Supply.  (Doc. No. 9 at ¶ 2, Doc. No. 30 at ¶ 2.)  Equitable Utilities, in turn consists of two components: Equitable Gas Company ("Equitable Gas") and Equitrans, L.P.  (Doc. No. 9 at ¶ 3, Doc. No. 30 at ¶ 3.)  Equitable Gas distributes natural gas to commercial and residential customers.  (Doc. No. 9 at ¶ 4, Doc. No. 30 at ¶ 4.)

In the mid to late 1990s, Equitable Gas transitioned from a non-competitive, highly regulated market in which customers had to obtain service from Equitable Gas to a competitive, less regulated market with "unbundled services" in which customers could choose

---

[1]The facts are taken from the parties' various submissions including their respective Statements of Undisputed Material Facts and Responses thereto, and are cited by their assigned Docket Numbers as Doc. No. __ at ¶ __.

their natural gas supplier.  (Doc. No. 9 at ¶ 6, Doc. No. 30 at ¶ 6.)  In the midst of this transition,

Murry Gerber ("Gerber") became Chief Executive Office of Equitable in May 1998, at the age of

45.  (Doc. No. 28 at ¶ 13, Doc. No. 41 at ¶ 13.)

Gerber testified in deposition that when he arrived, "Equitable Resources was a

company . . . in very dire condition."  It had lost the confidence of its shareholders and "had

fallen to the worst performance in the utility sector in America."  (Gerber Dep. at 6.)  With

regard to Equitable Gas, Gerber continued as follows:

> Equitable Gas Company itself was considered one of the worst gas companies in
> America.  Its return was dismal.  Its customer service was dismal.  It had an
> extraordinarily unprepared, unanalytical work force.  It was incapable of making
> informed decisions based on data and economic principle.  So like Equitable
> Resources, it was also in dire condition.

(Gerber Dep. at 7-8; Doc. No. 28 at ¶ 28, Doc. No. 41 at ¶ 28.)  During the first three to six

months of his employment he noticed three indicators of this financial condition.  (Gerber Dep. at

8.)  First, he noticed "that the company had invested in too many businesses for which it had no

capability to be successful. . . . [I]t had lost focus on a few core businesses."  (Gerber Dep. at 8;

Doc. No . 28 at ¶ 8.)  Consequently, in October 1998, a restructuring plan was approved with

specific action intended to improve the focus on Equitable's core businesses and reduce overall

cost structure.  In 1998 and 1999, Equitable sold its natural gas midstream operations in

Louisiana, Houston and Calgary; redirected offshore gas and oil exploration and production in

the Gulf of Mexico; improved the efficiency of Appalachian production operations by

decertifying certain pipeline facilities, exited certain noncore businesses; decentralized

administrative functions, and eliminated a substantial number of positions across the company.

(Doc. No. 9 at ¶ 12, Doc. No. 30 at ¶ 12.)  By the first quarter of 1999, a total of 164 employees

had left the Company.  (Doc. No. 9 at ¶ 13, Doc. No. 30 at ¶ 13.)  Second, Gerber noticed that the

return on capital of the company was the worst in the industry.  (Gerber Dep. at 9.)  Finally,

Gerber testified that he believed the following:

> [T]he processes and procedures by which work was done in the company were old.  They were flawed, not up to the standard of what a modern successful company's processes should be.  This includes not only the processes by which we did work, but also the processes by which we made decisions in the company.

(Gerber Dep. at 9-10; Doc. No. 28 at ¶ 29; Doc. No. 41 at ¶ 29.)  Gerber indicated that he

believed that the performance of an individual in any company affects the performance of every

other individual in the company.  To the extent that a substandard employee remains with the

company, in Gerber's view, it causes the performance of others to deteriorate.  (Doc. No. 28 at ¶

33, Doc. No. 41 at ¶ 33.)  In response to questioning by Plaintiff's counsel, Gerber also testified

in deposition about his understanding of the words renovate and reinvent found in a slogan or tag

line on the bottom of some company documents.[2]  Gerber testified as follows:

> Q.    What does renovate and reinvent – strike that.
>       Was that a slogan that you developed, renovate and reinvent,
>       something similar to that?
> A.    It was more than a slogan.  It was part of the strategy.  But, yes, I invented
>       that term or that phrase.
> Q.    Renovate and reinvent?
> A.    Yes.
> Q.    Could you describe what that means, please?
> A.    Yes, I can.  Renovate in the context of Equitable meant very simply to take
>       the company from its poor return on capital position and increase its

---

[2]Plaintiff points to Gerber's omission of the term "re-energize" in his deposition testimony at pages 45-46 and suggests that Defendant ignores the first word of the slogan because "it could be a code word reflecting age bias."  (Doc. No. 30 at ¶ 11.)  Plaintiff overlooks the fact it was Plaintiff's counsel who omitted the first word of the slogan in his questioning to Gerber.  Gerber's discussion as to his understanding of only the words "renovate" and "reinvent," was in direct response to Plaintiff's counsel's question.  Plaintiff was not asked about his understanding of the meaning of the word "re-energize."  See Gerber Dep. at 45-46.

> profitability such that it was earning at least the cost of capital, and that was what renovate meant.
>
> It was meant as a term to describe the early part of the process to turn Equitable around from the worst performing company in the industry, which it was, to a higher performing company in the industry, which it now is. So that's what renovate meant. It meant strictly speaking, improve the return on capital of the company.
>
> Reinvent specifically referred to a more prospective phase of the company which we're currently in wherein we do things – we do things in our company better than the next company in our industry does them. So it didn't matter whether it's a business line. If we were in a business line that another competitor had a similar business line in, we expect it to perform better. We expect our profit to be better. We expect our processes to be better. So it was a tag line for what we needed to do to be a long-term survivor in the industry, reinvent how we do what we do.
>
> So that's how that renovate and reinvent fit together. It wasn't a slogan. It had specific drivers, and it does have specific drivers.

(Gerber Dep. at 45-46.)

In the fourth quarter of 1998, Equitable Gas offered a Voluntary Resignation Program. (Doc. No. 28 at ¶ 7, Doc. No. 41 at ¶ 7.) Gerber testified as to the rationale for this Program and why it was offered. To this end, Gerber indicated that the Program was related to productivity. Gerber testified that he was changing the company strategy and there were a number of people who were working in the company that for various reasons were being employed in business lines and functions that were being de-emphasized in his new strategy. Consequently, Gerber and management believed that it was a good idea to offer a program where employees, who believed their jobs might be eliminated, or thought that their jobs or their unit's businesses would be de-emphasized, could utilize this Program to voluntarily change jobs or make a change in career or life at this point in time. (Doc. No. 28 at ¶ 8, Doc. No. 41 at ¶ 8.)

Gerber also introduced the concept of "value drivers" - the "actions that people or groups of people in organizations can take to improve the value of the company." (Doc. No. 9 at

¶ 14, Doc. No. 30 at ¶ 14.)  Gerber and senior management agreed upon company-level value

drivers that, in turn, prompted "individual more specific goals through the organization."  (Doc.

No. 9 at 15, Doc No. 30 at 15.)  Gerber believed that there had been problems with the old

performance evaluation plan.  (Gerber Dep. at 28.)  It did not include specifics with regard to

individual performance.  (Gerber Dep. at 28.)  Charlene Petrelli, Corporate Vice President of

Human Resources who started working at Equitable in October, 2000, testified that Gerber "was

trying to take an organization from an employee cultural perspective [that] had an entitlement

mentality and move it towards a high performing organization where performance was

differentiated and rewarded."  (Petrelli Dep. at 65.)  Petrelli explained what she understood to be

Gerber's use of the phrase "entitlement mentality" as follows:

> We had a number of employees who believed or perceived that when they came to
> work for Equitable Resources, their obligation to the company was to show up for
> work most of the time and that they were then guaranteed a job for life until they
> decided to leave the organization.

(Petrelli Dep. at 65.)  Petrelli testified that Gerber used the phrase "entitlement mentality" and

that "[h]e didn't have to explain much" as to how he came to this conclusion as she "had seen

that behavior in other organizations as well."  (Petrelli Dep. at 65.)[3]

Petrelli, a relatively new employee, also testified that she had learned from others

the history of the performance evaluation system at Equitable.  She learned from David Smith,

Equitable's Director of Compensation and Benefits, that at times "employees didn't receive a

_____

[3]Plaintiff directs this Court to Gerber's deposition wherein he testified that he did not
remember using the phrase "entitlement mentality."  (Doc. No. 28 at ¶ 27.)  Gerber testified that
"[t]here may be many ways to describe what the culture was.  Perhaps that's her way of
consolidating my opinions into one word."  (Gerber Dep. at 12.)

performance review at all, and when they did receive one, no manager wanted to deliver bad

news.  So everyone was told they were doing great."  (Petrelli Dep. at 82; Doc. No. 28 at ¶ 14.)

As to the old evaluation system, Smith testified that he did not produce reports or analysis

concerning the old system but indicated that the system could have been better.  (D. Smith Dep.

at 34-35; Doc. No. 28 at ¶¶ 16 & 17.)  When asked whether there were consequences associated

with a poor performance under the old evaluation system, Smith testified as follows:

> The program lacked discipline.  The rating system, everyone–everyone is too
> general.  Almost everyone fell into the middle.  We weren't distinguishing
> between exceptional performers and we weren't identifying poor performers.  We
> were giving almost everybody a middle rating and not using the performance
> management system in a way that I feel is most constructive for the company.

(D. Smith Dep. at 36.)  Thereafter, Smith and Petrelli were charged with designing a new

performance management system.  (Doc. No. 10 at ¶ 25, Doc. No. 30 at ¶ 25; D. Smith Dep. at

36.)  Smith testified regarding a meeting with Gerber, Spencer (former Corporate Vice President

of Human Resources), and Dave Porges in the second quarter of 2000 where a new performance

evaluation system was discussed.  The discussions concerned the ratings of "exceptional,"

"successful," and "unsatisfactory."  Smith indicated that the members of the meeting could not

answer the question as to whether anyone would ever rate someone as unsatisfactory.  (D. Smith

Dep. at 54.)  Consequently, the following discussion ensued:

> So the discussion went why don't we put some percentage down there of
> expectation, and then if a particular business unit can't meet that expectation,
> down the road they can certainly argue the case that someone shouldn't be an L
> performer, but at least give them some expectation to look at, a guideline.
> Q.    So, in other words, if a business unit didn't meet its expectation, you would
> expect the performance evaluation systems of that business unit to reflect there
> were some poor performers?
> A.    Correct.

(D. Smith Dep. at 54; Doc. No. 28 at ¶ 24.)

Hence, Equitable adopted a performance evaluation system requiring that a minimum 10% of employees in any given year be given an "L-Lower 10%" performance rating. (Doc. No. 28 at ¶ 34, Doc. No. 41 at ¶ 34.)  The other performance ratings included in the new performance evaluation system included "Exceptional" with a proposed distribution of 0 to 20% and "Successful" with a proposed distribution target of 70%.  The definitions for the various ratings were as follows:

> Exceptional-Makes significant contribution to department, Business Unit and/or Company value Drivers.  Overall performance far exceeds all requirements necessary to fulfill the principal duties, responsibilities, and expectations of position.
>
> Successful-Overall performance meets all requirements necessary to fulfill the principal duties, responsibilities, and expectations of the position.
>
> Lower 10%-On a relative basis, overall performance is in the lower 10% of the group for the applicable business unit.

(Appendix to Plaintiff's Brief in Opposition to Motion for Summary Judgment at Doc. No. 33 at pp. 6-7.)  Equitable Vice President Art Cantrell testified that the "policy was that we were attempting to adhere to the recommended distribution . . . of approximately 20 percent E's, 70 percent S's and 10 percent the L."  (Cantrell Dep. at 149.)  If the performance distribution as reflected on the spreadsheet was less than 10%, Davis, Vice President of Human Resources, would then meet with the functional heads of various departments and talk again about the distribution and make sure that everyone was evaluated properly.  Vice Presidents Cantrell and Crawford may raise questions if a distribution was below 10%.  If so, and after Davis spoke to supervisors, there would be another round of meetings with Crawford, Cantrell, and Davis

8

regarding the performance distributions.  (Doc. No. 28 at ¶ 38; Doc. No. 41 at ¶ 38.)  Davis

indicated that his role as an HR person in terms of talking with supervisors about whether their

ratings were inflated was that of facilitator; he never forced supervisors to change their ratings

but had "conversations with department heads challenging whether the goals that they set were . .

. going to get the department where it needed to be[.]"  (Davis Dep. at 338.)  Davis also testified

that an employee could meet all her value drivers or performance objectives, and still receive an

overall evaluation of "L" lower 10%.  (Doc. No.28 at ¶ 20, Doc. No. 41 at ¶ 20.)

        At all times relevant to her Complaint, Plaintiff worked in the customer service

department at Equitable Gas.  (Doc. No. 9 at ¶ 5, Doc. No. 30 at ¶ 5.)  In 2001 and 2002, Jan

Cumberledge, Manager of Customer Care and Billing Operations, was Linda Dumann's

immediate supervisor and Tracy Geyer, Vice President of Customer Relations, was Jan

Cumberledge's immediate supervisor.  (Doc. No. 9 at ¶ 52, Doc. No. 30 at ¶ 52.)

        Until mid-October 2001, Plaintiff was Supervisor of Training and Development

for the Equitable Gas Call Center.  (Doc. No. 9 at ¶ 67, Doc. No. 30 at ¶ 67.)

        Geyer transferred Plaintiff to the position of the Supervisor of Billing & Audit in

mid-October 2001, where she supervised a total of 16 people.  (Doc. No. 9 at ¶¶ 89, 102, 104,

Doc. No. 30 at ¶¶ 89, 102, 104.)  The Billing & Audit employees addressed errors in the billing

system and audited meter readings so that correct bills could be issued.  (Doc. No. 9 at ¶ 105,

Doc. No. 30 at ¶ 105.)  The Billing and Audit group had a reputation for being a tough group to

supervise as some were heavily involved in the union.  (Cumberledge Dep. at 51.)

        From the summer of 2001 until her discharge, Plaintiff also was the Customer

Service Department's representative on the Mobile Data Project Team, which was working on

replacing paper service orders with a system that would give field service personnel the customer information and service orders they needed electronically on computers in their truck.  (Doc. No. 9 at ¶ 109, Doc. No. 30 at 109.)  Plaintiff also was responsible for using a device called a METSCAN to upload from the meter readers' devices to the mainframe computer, gas meter readings that were going to be billed each evening.  (Doc. No. 9 at ¶ 110, Doc. No. 30 at ¶ 110.)

Plaintiff was given her 2001 performance review and placed on a performance improvement plan ("PIP") on February 14, 2002.  (Doc. No. 9 at ¶ 120, Doc. No. 30 at ¶ 120.)  Plaintiff received "L" ratings in 2 out of 8 categories, and received an overall rating of "L."  (Cumberledge Dep. Exhibit 1, Doc. No. 37 at p. 2.)  Cumberledge testified in deposition, however,  that Geyer felt "that the training should be the most heavily weighted since that was her primary job during . . . 2001."  (Cumberledge Dep. at 69.)  Cumberledge further explained that Geyer "felt that the training position is where Linda's performance primarily resulted in the L.  She didn't feel that Linda did a very good job training. . . ..  She wanted Linda out of training immediately."  (Cumberledge Dep. at 69.)

Plaintiff's primary responsibility while she was on the PIP was to supervise the Billing & Audit group.  (Doc. No. 9 at ¶ 125, Doc. No. 30 at ¶ 125.)  She was also given a specific list of objectives that had to be met during the performance improvement period.  (Doc. No. 28 at ¶ 51, Doc. No. 41 at ¶ 51.)  After being placed on PIP, Cumberledge met with Plaintiff on a weekly basis and received weekly reports from Plaintiff pursuant to company policy.  (Doc. No. 28 at ¶¶ 54-55, Doc. No. 41 at ¶¶ 54-55.)  Plaintiff's PIP document indicated that progress review dates were every Friday beginning February 22, 2002 through May 24, 2002.  (Doc. No. 28 at ¶ 56, Doc. No. 41 at ¶ 56.)

In an April 25, 2002 internal memorandum, Cumberledge reported to Dumann that she had met 6 out of the 8 specific objectives.  The two objectives that were designated as incomplete read as follows:

> 4).  Learn process to and document procedure to sync up CIS and METSCAN to ensure systems aligned.  Not complete BECAUSE distribution will retain function until we make a decision about meter reading automation going forward.
> . . .
> 8).  Review reasons for inaccurate bills and drive process for improvement: incomplete, date for completion extended to June 02.

(Cumberledge Dep. Exhibit 8, Doc. No. 37 at p. 6.)  After the discussion of the 8 (eight) specific objectives, the document includes a discussion entitled "Accomplishments" which describes many achievements by Plaintiff including specific instances of excellent performance regarding particular circumstances relating to her position.  A final discussion in the document is entitled "Performance Gap Identified," and provides as follows:

> Performance Gap Identified:
> Linda has good ideas but often expresses feelings of being overwhelmed and references the difficulty of her staff.  Her behaviors need modified to show consistent professionalism.
>
> Linda often has difficulty obtaining information from outside sources to complete her initiatives.  An [sic] few example [sic] is the revised "Suspected Non-Registering Letter", and various responses from IT regarding a sampling of all billing invoices, suspected system errors, all turn-off orders that are not complete because of no access.  She has not been successful in communicating metscan issues with HR regarding transferring work activities or communicating with distribution concerning their responsibility to complete the trouble maintenance (999) orders.  She needs to hold others accountable and continue to drive the process to receive the result.
>
> Her behaviors with her staff need to be firm, concise and direct and her team needs to be held to task.

11

(Cumberledge Dep. Exhibit 8, Doc. No. 37 at p. 7.)

      Cumberledge resigned from Equitable; her last day with the company was August 30, 2002.  (Cumberledge Dep. at 72.)  Cumberledge testified concerning her last day and the circumstances surrounding her resignation as follows:

Q.      Why did you leave on that day?

[objection]

A.      I had given Tracy Geyer my letter of resignation on a Monday and told her that I would stay for two weeks, and she said she wanted to sit down with me and go over some things, and the only day she had available was Friday.  It was prior, right prior to lunch.  And so when I went to her office, Christine Chapman was there as well, and when I sat down, I could see all of the documents, the performance improvement plan, the memos, and everything like that.

Q.      Which performance improvement plan memos?

A.      Linda's.  It was Linda's file they had out.  I had no knowledge I was meeting with Christine Chapman at all.  When I sat down, Tracy made a comment, "Look at Jan, she's smiling.  She's so happy.  She won't be smiling when she sees what we're here about."
When I looked down and saw what it was, I said, "absolutely you're right."  I picked up my papers, and I went to my office, and I said, "I have another week's vacation.  I'm out of here."

. . .

Q.      Why were you so upset?

[objection]

A.      I was upset because it was sneaky.  I didn't agree with what they were planning on doing.  I had no prior knowledge.  I was misinformed about the reason for the meeting.  It was just – I told her this – . . .. It was just a perfect ending to what I had been living [sic] for the year.

Q.      It had been what?

A.      The perfect ending for what I had been living like in the year prior to my resignation at Equitable under Tracy Geyer's direction.

Q.      What are you referring to when you say what you were living or how you were living?  What do you mean?

A.      She was just an incompetent manager.  I doubted if she ever managed a staff.  She had absolutely zero people skills, and she was never satisfied.

Q.      How would you characterize how she treated her subordinates?  Was she fair?

[objection]

A.      She was fair in that she treated everyone like dirt.

12

(Cumberledge Dep. at 73-74.)

    That same day, on August 30, 2002, Plaintiff was discharged.  (Doc. No. 9 at ¶ 144, Doc. No. 30 at ¶ 144.)

   B. <u>Legal Standard</u>

    Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a <u>genuine issue for trial</u>" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  <u>Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e) (emphasis added by <u>Matsushita</u> Court).  An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  <u>Anderson v. Liberty-Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

    Defendant argues that summary judgment should be granted in its favor on the

following grounds: 1) Equitable has articulated legitimate, nondiscriminatory business reasons for Plaintiff's discharge, namely, Plaintiff's poor performance and failure to satisfactorily complete the goals of a performance evaluation program implemented as part of a long-term strategy to renovate and reinvent Equitable; 2) Plaintiff cannot show by preponderance of the evidence that Defendant's explanation is pretextual because a) Plaintiff's claim is defeated by her own testimony and by the testimony of her friend and supervisor Cumberledge, b) Plaintiff was discharged for legitimate reasons, c) Cumberledge, Plaintiff's friend and supervisor, does not believe age was a factor, d) Plaintiff and Cumberledge knew that things were not going well for Plaintiff at Equitable, e) Plaintiff's October 2001 transfer from her position as Supervisor of Training and Development for the Equitable Gas Call Center to Supervisor of Billing & Audit was made for non-discriminatory business reasons, f) the hiring of Robert Hill in Plaintiff's former position of call center supervisor was done for non-discriminatory reasons, g) there is extensive undisputed evidence of the non-discriminatory basis for the performance management system adopted by Equitable; and 3) Plaintiff cannot make out a prima facie case of gender discrimination and even if she could, there is absolutely no evidence that gender played a role in Equitable's hiring Robert Hill.

In opposition to Defendant's Motion for Summary Judgment, Plaintiff argues the following: 1) Plaintiff has substantial evidence of pretext including the fact that a) she achieved all performance improvement goals and contradictory positions taken by managers regarding the same establish material factual disputes, b) supervisor Geyer admitted that Plaintiff achieved PIP goals but stated that such achievement was irrelevant, c) Geyer's admission that she did not follow company policy on periodic review dates is evidence of pretext, d) claiming that

Plaintiff's PIP was extended was pretext for hiring a younger male in Plaintiff's former position

of call center supervisor, e) Plaintiff was replaced as a trainer by a younger female who had no

knowledge of the business, f) Geyer's statement to Cumberledge that Plaintiff would receive an

"L" before Cumberledge did Plaintiff's performance review is evidence of pretext, g) the

corporate culture at Equitable is admissible evidence of pretext, h) Plaintiff's sudden drop in

performance after 28 years with the company, and company statistics regarding the average age

of the workforce is evidence of pretext.


       C.    <u>Analysis</u>

         <u>ADEA, Title VII, and PHRA claims</u>

         Plaintiff avers that Defendant terminated her employment on the basis of her age

and gender in violation of the ADEA, Title VII, and the PHRA.  <u>See</u> Amended Complaint at

Doc. No. 2.  When there is no direct evidence of discrimination, a plaintiff may use

circumstantial evidence to establish discrimination using the three-prong burden shifting analysis

originally set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).[4]  The

parties agree that the claims presently before this Court are governed by the burden shifting

analysis of <u>McDonnell Douglas</u>.[5]  <u>See also</u> <u>Fasold v. Justice</u>, 409 F.3d 178, 183-84 (3d Cir.



[4]Plaintiff's Title VII and ADEA claims are governed by the same burden shifting analysis.  <u>See</u> <u>McKenna v. Pacific Rail Service, Inc.</u>, 32 F.3d 820, 825-26 & n. 3 (3d Cir. 1994).

[5]The United States Court of Appeals for the Third Circuit has stated "that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."  <u>Fasold</u>, 409 F.3d at 184 n. 8 (quoting <u>Fogleman v. Mercy Hosp., Inc.</u>, 283 F.3d 561, 567 (3d Cir. 2002)).  Finding no such distinguishing language, the Third Circuit has interpreted the relevant provisions of the ADEA and the PHRA "as applying identically . . . and as being governed by the same set of

2005).

   Pursuant to the McDonnell Douglas burden shifting analysis, a plaintiff employee must first establish a prima facie case of discrimination.  Fasold, 409 F.3d at 184.  For purposes of the summary judgment motion presently at bar, Defendant "assume[s] that Plaintiff can establish a prima facie case."  (Memorandum in Support of Defendant's Motion for Summary Judgment, Doc. No. 10 at p. 4.)  Thereafter, the burden of production (but not the burden of persuasion) shifts to Defendant employer to articulate some legitimate, nondiscriminatory reason for Plaintiff's termination.  See Fasold, 409 F.3d at 184 (citing Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 n. 11 (3d Cir. 2004); Shellenberger v. Summit Bancorp. Inc., 318 F.3d 183, 187 (3d Cir. 2003)).  The employer need not prove, however, that the proffered nondiscriminatory reasons actually motivated the decision to terminate.  See Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (discussing Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000)).  If the Defendant employer is able to articulate one or more such reasons, the Plaintiff "employee must then proffer evidence that is sufficient to allow a reasonable finder of fact to find by preponderance of the evidence that the employer's proffered reasons are false or pretextual."  Id. (citing Sarullo v. United States Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003)).

   To survive a motion for summary judgment at step three of the burden shifting analysis, Plaintiff must present some evidence from which a reasonable jury could either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the

---

decisional law."  Id. (citing Fogleman, 283 F.3d at 567).  See also Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083-84 (3d Cir. 1995) (PHRA and Title VII are interpreted similarly).

employer's action." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (citing St. Mary's Honor

Ctr. v. Hicks, 509 U.S. 502 (1993); Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509,

523 (3d Cir. 1992)).  In Fuentes, the United States Court of Appeals for the Third Circuit further

explained the quantum of proof required at step three as follows:

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

Fuentes, 32 F.3d at 765 (emphasis in original) (quoting Ezold, 983 F.2d at 531) (other internal

quotations omitted).  That is, the plaintiff must show, not simply that the defendant's articulated

business reason was wrong, "but that it was so plainly wrong that it cannot have been the

employer's real reason." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir.

1997).  The plaintiff must "present evidence contradicting the core facts put forward by the

employer as the legitimate business reason for its decision." Kautz, 412 F.3d at 467 (emphasis

added).  Evidence contradicting these core facts must be directed at the decision-maker's belief;

plaintiff's own beliefs and personal judgments, without more, will not raise a genuine issue of

material fact.  Simpson v. Kay Jewelers, Inc., 142 F.3d 639, 647 (3d Cir. 1998) ("Simpson's

view of her performance . . . is not relevant.").  It is important to note that in light of this standard

for proving pretext at step three of the McDonnel Douglas paradigm, the United States Supreme

Court has made it clear that a plaintiff is not required to present affirmative evidence of

discrimination in addition to proof of pretext.  See Reeves v. Sanderson Plumbing Products, Inc.,

530 U.S. 133, 147 (2000).  Instead, "[i]n appropriate circumstances, the trier of fact <u>can</u>

<u>reasonably infer</u> from the falsity of the explanation that the employer is dissembling to cover up a

discriminatory purpose." <u>Id</u>.  (emphasis added).[6]  The United States Court of Appeals for the

Third Circuit recently discussed the impact of <u>Reeves</u> on the <u>Fuentes</u> standard for proving pretext

as follows:

> Although <u>Reeves</u> makes clear that we may not require affirmative evidence of
> discrimination in addition to proof of pretext, it does not change our standard for
> proving pretext which "places a difficult burden on the plaintiff."

<u>Kautz</u>, 412 F.3d at 467 (quoting <u>Fuentes</u>, 32 F.3d at 765).

Here, Defendant has met its burden of production by articulating legitimate

business reasons for Plaintiff's termination.  According to Defendant, Plaintiff was discharged

because of poor performance, and her failure to satisfactorily complete her PIP objectives.

Plaintiff claims that there are weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the Defendant's proffered legitimate reasons that a reasonable

factfinder <u>could</u> rationally find them "unworthy of credence," and hence infer that the Defendant

did not act for these non-discriminatory reasons.  <u>See</u> <u>Fuentes</u>, 32 F.3d at 765.  That is, Plaintiff

argues that Plaintiff was discharged pursuant to a company-wide plan to get rid of older

employees.  Plaintiff contends that there is substantial evidence of pretext.

First, Plaintiff refers the Court to two statements that she claims create a disputed

question of material fact as to whether Plaintiff satisfactorily completed her PIP goals.  The first

statement is Cumberledge's deposition testimony that Plaintiff met each performance objective

---

[6]In <u>Reeves</u> the United States Supreme Court granted certiorari to resolve a split in the
circuits as to whether a plaintiff is required to produce affirmative evidence of discrimination in
addition to proof of pretext.  530 U.S. at 140.

outlined in the PIP and there were no reasons to justify her discharge.  (Doc. No. 29 at p. 4-5;

Cumberledge Dep. at 138.)  The second statement, also found in Cumberledge's deposition,

concerns Geyer's opinion relating to this same issue as follows:

> Q.    Do you know if Tracy Geyer agreed that Ms. Dumann's objectives had
>        been met?
> A.    Yes.  She did agree that Linda Dumann's objectives had been met.
> Q.    What's your basis for saying that ?
> A.    She said that .
> Q.    When?
> A.    I don't recall.
> Q.    What exactly did Ms. Geyer tell you?
> A.    I recall her saying that it really didn't matter what was on the form, that it
>        was more than what was written on the form.  And I would guess she said
>        that on August 30, '02.
> Q.    Did Ms. Geyer tell you Linda Dumann has met the objectives on the PIP?
> A.    I don't recall she said it that way.
> Q.    It's important to understand, as best you can recollect, what exactly Ms.
>        Geyer said.  Did she say Linda Dumann has completed the PIP?  Did she
>        say it doesn't matter what's written on the PIP because it's more than
>        what's written on the PIP?
>                                            . . .
> A.    Let me think about it for a minute.  I believe Christine Chapman was at this
>        meeting as well that Tracy and I were talking about maybe Linda and Lavetta's
>        performance at the same time, and I believe that I said to them that both of them
>        have met all of their objectives, and I believe Tracy Geyer's response to that was,
>        "Yes, but it doesn't matter what's on the objectives.  It's overall" or something to
>        that matter.  I do believe that she acknowledged that the objectives were met.

(Cumberledge Dep. at 150-51.)  Plaintiff argues that this testimony creates a disputed question of

material fact as to Defendant's reasons or motives for terminating the Plaintiff.  Yet, when placed

in context of Cumberledge's entire deposition (rather than extracted and isolated for purposes of

argument) it is clear that no reasonable fact finder could infer that Defendant was driven by a

discriminatory animus.

　　　　　For instance, the following testimony reveals Cumberledge's understanding of

Geyer's comments, and Cumberledge's opinion concerning Geyer's motive:

> Q.   I want to know if you have any understanding as to what Ms. Geyer was
> getting at when she was saying something to the effect of how the
> objectives – it doesn't matter if the objectives have been met.  It's overall?
>                                [objection]
> A.   The understanding that I had, as I mentioned earlier today, is that Tracy
> Geyer was trying to turn the staff.  She was trying to bring new talent in.
> She wanted to move other staff in.  She wanted to move a lot of them out,
> but couldn't move them all at the same time.  That was her objective.
> That's what she said to me.
> Q.   So it's your belief that what Ms. Geyer was intending to do was in ones or
> twos give people Ls and get them out of the group?
> A.   Yes.

Cumberledge Dep. at 153-54.  Cumberledge's testimony slightly earlier in the deposition further

describes Cumberledge's opinion as to Geyer's motivations:

> Q.   I'd like to know what other factors there were in this unhealthy work
> environment.
> A.   Again, I can only give you what I think, my opinion, and what I think is
> that there were rules that were set by senior management, i.e., you must
> rank ten percent of your staff low.  I think that the intent was good
> initially, and I think that as it went down layer by layer by layer, it was
> missed.
>          There was a – I don't know how to explain this to you.  But I think
> that Murry Gerber's intent was good at how he wanted to turn the
> organization.  I think that Art Cantrell was able to capture a good
> percentage of Murry's vision.  But when it got to Tracy's level and then it
> got down to my level, it became misconstrued.  There was a missing link
> between her understanding of what Murry Gerber was trying to
> accomplish.
> Q.   What was it she was missing in your view?
> A.   She was not getting – just wasn't getting what we were looking for there.
> She was missing.  She was reading the words and the text, reading that she
> had to rank ten percent low, following word by word, line by line, trying to
> follow exactly, when there are times what you have to interpret
> instructions and read between the lines and manage your staff to a certain
> ability.  She wasn't getting the intent.  She was missing it.
> Q.   I'm not sure I really understand what you're getting at there.  I'm not
> trying to put words in your mouth.  I'm trying to understand.
>          Are you saying that Ms. Geyer thought she needed to have ten

|      | percent of her employees rated L whether or not they actually were Ls? |
|------|------------------------------------------------------------------------|
| A.   | Yes.                                                                   |

. . .

| Q. | Do you have any reason to believe that the manner in which Ms. Geyer implemented her understanding of the L ten percent program, that she did so based on the age of her subordinates? |
|------|------|

[objection]

| A. | No. |
|------|------|
| Q. | Do you have any basis or reason to believe that the manner in which Ms. Geyer implemented her understanding of the L ten percent as to her subordinates, she did so because of gender? |
| A. | Do I have any reason to believe?  No. |

(Cumberledge Dep. at 128-30.)

Cumberledge's above testimony is particularly revealing in light of the undisputed fact that Cumberledge and Dumann were very good friends who went on week-long vacations together every year for about seven years, went away together for weekends at least twice while Cumberledge was Dumann's supervisor, and went out to dinner together, with other female colleagues, about four times a year.  (Doc. No. 9 at ¶ 53, Doc. No. 30 at ¶ 53.)

Likewise, this testimony reveals Cumberledge's frustration with Geyer's misapplication of the "L" ten percent rating requirement and how it affected Plaintiff's performance review.  Moreover, this testimony provides a revealing backdrop for Cumberledge's statement that she believed Plaintiff had met her PIP objectives and that she should not have been discharged.  That is, in light of this deposition testimony, no reasonable finder of fact could rationally find that Plaintiff's discharge was driven by a discriminatory animus.

In addition, portions of the April 25, 2002, 60-day PIP review memorandum, other portions of Cumberledge's testimony, and portions of Plaintiff's own testimony, specifically indicate that Plaintiff was having difficulties in various positions that she held at

21

Equitable Gas.  First, the final paragraphs of the April 25, 2002, 60-day PIP Review Memorandum entitled "Performance Gap Identified," quoted in section II.A., <u>supra</u>, indicate deficiencies in Plaintiff's performance.  (Doc. No. 37 at p. 7.)  Plaintiff has not attempted to dispute these core facts proffered by Defendant in support of its discharge decision nor has she presented evidence that she did perform well where Defendant says she did not.

The following testimony of Plaintiff and Cumberledge reflects deficiencies in Plaintiff's performance:

1) Cumberledge testified that Geyer was extremely dissatisfied with Plaintiff's training skills, wanted her out of training immediately, and believed that because training was her primary job in 2001, should be the most heavily weighted performance review item.  (Cumberledge Dep. at 69.)

2) Cumberledge also testified that the Quality Assurance Supervisor of all operations, Therese Nolfi, was dissatisfied with Plaintiff's training skills. (Cumberledge Dep. at 34-35, 156.)

3) Cumberledge further indicated that Plaintiff told her that she was thinking of leaving the company because "she wasn't happy supervising the audit team" and that possibly her health was not "very good."  (Cumberledge Dep. at 131-32.) Cumberledge testified that she asked Plaintiff why she wanted to work at Equitable Gas.  Cumberledge indicated that the reason she asked Plaintiff this question was because "it was an unhealthy work environment, and I could see her health decreasing."  (Cumberledge Dep. at 134.)

4) At Cumberledge's suggestion, Plaintiff went to see Geyer and told Geyer,

"maybe this job isn't cut out for me" and maybe she "would be a better fit in

another position;" that it seemed as though whatever she did "it was never good

enough" to please Geyer; and that she would be happy just being a customer

service representative.  Dumann also asked about the possibility of a buyout.

(Dumann Dep. at 179-82.)

5) Dumann testified that she cried in front of the Billing & Audit employees on

more than one occasion and had called Cumberledge on the phone while crying.

(Dumann Dep. at 208-11.)

       Plaintiff again raises these issues in the context of Cumberledge's testimony that

Geyer told her to give Plaintiff an "L" rating before Cumberledge actually completed Plaintiff's

performance evaluation for 2001.  (Doc. No. 29 at p. 9-10.)  Again, this same testimony by

Cumberledge, Plaintiff's friend, demonstrates an absence of discriminatory animus by Geyer.

Instead, Cumberledge paints a picture of a mid level supervisor who misapplied or

misunderstood upper management directives.

       Next, Plaintiff argues that deviation from company policy is evidence of different

treatment and therefore, proof of pretext.  Specifically, Plaintiff argues that Geyer claims that

Dumann's PIP was extended beyond the typical PIP period, in violation of company policy, and

that Plaintiff was not notified of the extension, nor was Plaintiff given periodic review dates for

the extension, also in violation of company policy.  (Doc. No. 29 at p. 6.)  At Cumberledge

Deposition Exhibit 2, Performance Improvement Plan for Linda Dumann, Progress review dates

were established for every Friday beginning February 2, 2002 through May 24, 2002.  (Doc. 37 at

p. 5; Doc. No. 28 at ¶ 56; Doc. No. 41 at ¶ 56.)  Plaintiff was also to provide written progress

reports each week and did so until May 22, 2002 when she was told to stop.  (Doc. 35 at p.4; Doc. No. 28 at ¶ 68, Doc. No. 41 at ¶ 68.)  Plaintiff contends that the 3 (three) month period between the last of Plaintiff's reporting dates and her eventual discharge on August 30, 2002 is an unusual and conspicuous gap or deviation from company policy for which Geyer can provide no "credible" explanation, and hence, provides evidence of pretext.  (Doc. No. 29 at 6-7.)

       With regard to this three month time period, Steve Davis, Vice President of Human Resources testified in deposition that PIPs could be extended if necessary.  (Davis Dep. at 305.)  Further, Geyer testified that at this time, Plaintiff, a front line supervisor, was on PIP. Geyer further testified that her (Geyer's) Call Center Supervisor, Jerry Smith, was getting ready to retire.  Geyer noted that "you can't run a business and overturn everybody in your department."  (Geyer Dep. at 35.)  She continued that she had to maintain business continuity so once Smith's replacement was determined, Geyer could focus on the PIPs.  Consequently, Smith's retirement had an effect as to when Geyer planned to "exit Dumann from the organization."  (Geyer Dep. at 36.)  Geyer emphasized that "the organization needed to maintain stability in terms of knowledge of the gas business."  Consequently, to preserve business continuity, she would not take further personnel actions until Smith's replacement was hired. (Geyer Dep. at 38.)[7]  The factual issue before this Court, as described in <u>Fuentes</u>, is whether discriminatory animus motivated this Defendant employer, not whether this employer is wise,

_____

[7]Plaintiff directs this Court to Geyer's failure to answer Plaintiff's final deposition question as to why Marie Sonnet (who filled in for Plaintiff until Therese Nolfi was hired in Billing & Audit ) could not have filled in for Plaintiff sooner if she had been discharged prior to August 30, 2002.  (Geyer Dep. at 142.)  A careful review of this testimony, however, reveals that Geyer responded that she wanted "an experienced utility person" to replace Smith "prior to making any moves [with regard to personnel.]" (Geyer Dep. at 144.)

prudent, or competent.  See 32 F.3d at 765.  Again, Plaintiff has failed to demonstrate such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendant's

proffered reasons that a reasonable fact finder could rationally find them unworthy of credence

and hence, infer a that Defendant did not act for the proffered non-discriminatory reasons.  See

Id.

_____Plaintiff's next argument is her first and only argument concerning whether she

was the victim of gender discrimination and concerns what Plaintiff has characterized as the

conspicuous or unusual gap between May 22, 2002 until August 30, 2002.  Plaintiff contends that

her PIP concluded at the end of May and that Defendant's assertions to the contrary are a pretext

for its discriminatory intent to place a male in her old position of Supervisor of the Call Center.

(Doc. No. 29 at 8.)[8]  Plaintiff notes that Jerry Smith was retiring from the call center position in

October 2002, and that the position came open in June 2002.  Plaintiff was told that she was not

interviewed for the position because she was on PIP.  Plaintiff contends that "[k]eeping

[Plaintiff] on the PIP plan beyond May 24, 2002 was the way Geyer could more easily bring in a

younger replacement, Robert Hill, a male less than 40 years of age."  (Doc. No. 29 at p. 8.)

Plaintiff continues that Defendant's reason for not hiring Plaintiff (because she was still on PIP

and therefore could not be transferred during the next rating year) was pretextual because she was

obviously qualified for the position.  Yet, Plaintiff herself testified that Hill was hired because

the company wanted "somebody completely different there.  They don't want the same old

Equitable people there anymore.  They want to get rid of the people that have knowledge.  They

_____

[8]Plaintiff's argument that she believed that she was no longer on PIP in June appears
particularly disingenuous in light of the fact that the April 25, 2002 memorandum specifically
indicated that as to at least objective No. 8, the time for completion was extended to June 2002.

want people they can mold into who they want them to be." (Dumann Dep. at 144.) Further, Cumberledge told Plaintiff that Equitable was "just looking for a different type of person" for this position. (Dumann Dep. at 154-55.) Finally, Cumberledge testified that she interviewed Hill for the position, liked him and recommended that he be hired. (Cumberledge Dep. at 194-95.) Finally, as noted above, Cumberledge testified that she did not believe that Geyer was motiviated by gender issues in her performance review of Plaintiff. (Cumberledge Dep. at 130.) Again, Plaintiff has failed to raise a genuine issue of fact that the proffered reasons for Plaintiff's discharge were pretextual.

Plaintiff argues that additional evidence of Geyer's alleged suspect motives is found in Plaintiff's 2001 transfer from Training and Development. Plaintiff directs this Court to Cumberledge's testimony that the younger female hired in Plaintiff's former training position, Amy Slokan, had no knowledge of the business and had to observe others being trained before she could begin her training responsibilities. (Cumberledge Dep. at 70.)

Yet, the parties agree that Amy Slokan was hired to become the learning and development specialist in March 2002. (Doc. No. 9 at ¶ 92; Doc. No. 30 at ¶ 92.) Slokan had earned a bachelor's degree in organizational leadership and development. She took courses that included research and design of training materials, including research on customer service and call center behavior. (Doc. No. 9 at ¶ 93; Doc. No. 30 at ¶ 93.) While in college she did training and development work for a call center at Teletech Holdings, a company that handled customer service for companies that outsourced that function. (Doc. No. 9 at ¶ 94; Doc. No. 30 at ¶ 94.) The undisputed evidence of record reveals that Slokan possessed an element of expertise that Plaintiff did not share in the area of training. Plaintiff has adduced insufficient evidence such

26

that no reasonable fact finder could reasonably conclude that Slokan's qualifications, particularly as related to training, are so unrelated to her employment in Plaintiff's former training position, as to be a pretext for intentional discrimination.  See Stanziale, 200 F.3d at 107 (summary judgment affirmed on ADEA claim where Plaintiff failed to adduce evidence sufficient for reasonable factfinder to conclude that younger female co-employee's superior qualifications were so unrelated to her employment as to be pretext for intentional discrimination).

Plaintiff's next two arguments are  that corporate culture is admissible evidence of pretext.  (Doc. No. 29 at pp. 10-11.)  Plaintiff directs this Court to various statements already discussed herein including CEO Gerber's tagline "re-energize, renovate and reinvent," and Petrelli's testimony concerning an "entitlement mentality."  When placed in context of the undisputed evidence of record regarding CEO Gerber's efforts to revitalize an ailing company, and his perceptions and opinions regarding Equitable's workforce, no reasonable fact finder could conclude that these statements reflect a discriminatory animus.

Moreover, as to the other comments argued by Plaintiff, these comments are too remote in time and place to have any bearing on Plaintiff's case.  The United States Court of Appeals for the Third Circuit has recognized that a plaintiff may offer circumstantial evidence of intentional age discrimination in the form of a "supervisor's statement relating to formal or informal managerial attitudes held by corporate executives."  Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 132 (3d Cir. 1997) (citing Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 333 (3d Cir. 1995); Lockhart v. Westinghouse Credit Corp., 879 F.2d 43, 54 (3d Cir. 1989)).  The Ryder court continued its analysis as follows:

This is not to say that an ageist statement made by any corporate executive

27

is relevant as evidence of "corporate culture," which would circumstantially prove a discriminatory animus.  Rather, the court must, as we did in <u>Lockhart</u> and <u>Brewer</u>, evaluate factors pertaining to the declarant's involvement in recognizing a formal or informal managerial attitude, including the declarant's position in the corporate hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action.

<u>Ryder</u>, 128 F.3d at 133.

Here, Plaintiff refers to the following remarks:

1.  Vice President Fred Darlena's alleged agreement with a comment made by an employee that "it looked like the company was getting rid of older workers."

2.  Darlena's comments about the need for "New Blood, New Ideas, New Thinking."

3.  A comment by Carl Rizzo, head of information technology to one of the officials of the independent contractor hired to install a new computer/information system "not to listen to Equitable employees because they are old and the Company needed new thinking."

4.  Vice President of Human Resources Steve Davis' comment to Ron Hardinger, a plaintiff in a separate case, at the time of his discharge, that Davis hoped he would announce his resignation because Davis was concerned about the company's "image" given that so many older workers had been terminated from the company.

Darlena and Rizzo were managers in different departments and had no connection to Plaintiff's discharge.  Further, the content of comments 1, 2, and 4 above, are innocuous in light of Gerber's goal to revitalize the company, and the subsequent application of new evaluation and voluntary resignation programs to this older workforce.  Also, Davis' comment was made to an employee in Equitrans one year after Plaintiff's discharge.

Next, Plaintiff argues that Plaintiff's sudden drop in performance after 28 years

28

with the company is probative of pretext.  This fact, however, standing alone, will not establish

pretext.  See Billet v. CIGNA Corp., 940 F.2d 812, 826-27 (3d Cir. 1991), overruled in part on

other grounds by St Mary's Honor Center v. Hicks, 509 U.S. 502 (1993) ("[P]rior good

evaluations alone cannot establish that later unsatisfactory evaluations are pretextual.")

Moreover, as discussed at length above, there is undisputed evidence in the record that Defendant

perceived, and Plaintiff was experiencing, difficulties in her employment at Equitable Gas.

Additional evidence of this difficulty can be found in the following deposition testimony of

Plaintiff's colleague, Jerry Smith:

> Q.    Did you ever talk to Linda about how things were going in [sic] the
>        supervisor of billing and audit?
> A.    Oh, sure.
> Q.    What did you learn from that conversation with her?
> A.    Well, that things were extremely difficult, but you didn't have to talk to
>        Linda to see that.
> Q.    Could you explain?
> A.    Well, her emotions from time to time, we were all concerned about Linda
>        because there were periods where you could see where she was visibly
>        shaken.  We were all very much concerned as colleagues and friends, if
>        you will, of her well-being.
> Q.    Did you have any information from her about whether things were getting
>        better or worse as time went by?
>                     [objection]
> A.    I don't know about conversations, but, again, if we did, in just watching
>        Linda and seeing some of the things that happened, if I had to draw an
>        opinion –
>                     [objection]
> A.    In my opinion, things were getting worse as time progressed.

(G. Smith Dep. at 17-18.)

    Finally, Plaintiff directs this Court to statistics that reflect a decrease in average

age of Equitable Gas employees over a five year period to support an inference of age

discrimination.  The parties do not dispute that the workforce at Equitable Gas was an older

workforce.  (Doc. No. 28 at ¶ 4, Doc. No. 41 at ¶ 4.)  The Plaintiff contends that the average age

of the workforce decreased from 44.04 to 41.87, while the Defendant asserts that Plaintiff's

calculations are incorrect, and the decrease was actually from 44.52 to 42.33.  Affording Plaintiff

every favorable inference, this Court concludes that in light of the undisputed fact that the

workforce at Equitable Gas was indeed, an older workforce, no reasonable fact finder could infer

a discriminatory animus based the proffered statistics, especially when viewed in conjunction

with all the other evidence of record.

_____This Court has conducted a thorough and painstaking review of the record and

recognizes the difficult situation in which the Plaintiff finds herself after her termination.  It is

not a violation of the ADEA, however, for an employer to take steps to rehabilitate an ailing

company, even if the rehabilitation requires the implementation of a voluntary resignation

program, and a new performance evaluation plan that results in the termination of many

employees in an indisputably older workforce.  What the ADEA does prohibit is the selection of

those employees for termination on the basis of their age.  Here, Plaintiff has failed to put

forward "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

[Defendant's] proffered legitimate reasons for its action that a reasonable factfinder could

rationally find them unworthy of credence."  See Fuentes, 32 F.3d at 765 (internal quotation and

citation omitted) (emphasis in original).  Consequently, this Court must recommend that the

Defendant's Motion for Summary Judgment be granted.

III.     <u>CONCLUSION</u>

_____It is respectfully recommended that the Motion for Summary Judgment filed by

Defendant Equitable Resources, Inc. at Docket No. 8 be granted.

In accordance with the Magistrate's Act, 28 U.S.C. § 636(b)(1)(B) and (C), and

Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the

date of service to file objections to this Report and Recommendation.  Any party opposing the

objections shall have seven (7) days from the date of service of objections to respond thereto.

Failure to file timely objections may constitute a waiver of any appellate rights.




s/ Lisa Pupo Lenihan
LISA PUPO LENIHAN
United States Magistrate Judge


Dated: August 23, 2006


cc: The Honorable Terrence F. McVerry
    United States District Court Judge

    Edward A. Olds
    1007 Mount Royal Boulevard
    Pittsburgh, PA 15223
    Email: edolds@earthlink.net

    Michael J. Lorence
    1007 Mount Royal Boulevard
    Pittsburgh, PA 15223

31

Email: lorence@lcsys.net

Joseph P. McHugh
Reed Smith
435 Sixth Avenue
Pittsburgh, PA 15219-1886
Email: jmchugh@reedsmith.com

Martha Hartle Munsch
Reed Smith
435 Sixth Avenue
Pittsburgh, PA 15219-1886
Email: mmunsch@reedsmith.com